STATE OF CONNECTICUT *v.* AUSTIN
GRANT HAUGHWOUT
(SC 20547)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The defendant was convicted of one count of interfering with an officer,
one count of disobeying the direction of an officer while increasing the
speed of a motor vehicle in an attempt to escape or elude, and two
counts of assault of a peace officer in connection with two separate
incidents between him and certain police officers. During the first inci-
dent, an officer, S, turned his cruiser into a parking lot adjacent to a
library at about 9 p.m. S observed the defendant walking quickly from
a picnic table near the library to a parked vehicle in the lot. Once in
the vehicle, the defendant took a few moments to set up a dashboard

State *v.* Haughwout

camera in order to record the incident. Shortly thereafter, the defendant drove his vehicle toward the exit, S turned his cruiser's light bar on briefly, and S motioned with his hand for the defendant to pull alongside the cruiser, which he did. After a brief dialogue, S told the defendant to put his vehicle in park. The defendant ignored S's command and abrubtly began to drive toward the exit. S turned on his lightbar again and pulled his cruiser behind the defendant's vehicle. The defendant stopped, shouted to S, "hey asshole," and then proceeded to exit the parking lot and to drive north on a local road. Another officer, who had just arrived at the scene, and S pursued the defendant, and the defendant stopped a short distance up the road. After the defendant continued to argue with the officers and declined a request to provide his operator's license and registration, the officers let him leave the scene and applied for an arrest warrant. The second incident occurred when the defendant, in response to being informed by the police that they had obtained a warrant for his arrest, arrived at the police station. The defendant brought a video camera with him and began recording. The defendant was told by an officer, V, that he was in custody and under arrest. V also told the defendant that he had to secure the camera and that it would be returned. The defendant declined to surrender the camera and attempted to leave. A struggle between the defendant and V ensued, shortly after which another officer, D, came to V's assistance. Once the defendant was subdued, he was carried to the booking area. Before trial, the defendant moved to suppress evidence derived from the encounter relating to the first incident, claiming that S lacked a reasonable and articulable suspicion that the defendant had been engaged in criminal activity and that his detention was therefore illegal. The trial court denied that motion. On appeal from the judgments of conviction, the defendant claimed, inter alia, that the trial court improperly denied his motion to suppress and that the evidence was insufficient to support his conviction of both counts of assault of a peace officer. *Held*:

1. The trial court improperly denied the defendant's motion to suppress evidence relating to the first incident, as the defendant's detention by S in connection with that incident was unlawful, and, accordingly, the judgment of conviction of interfering with an officer and disobeying the direction of an officer was reversed; the defendant's conduct could not, in and of itself, give rise to a reasonable and articulable suspicion of criminal activity, as the totality of circumstances did not objectively indicate that the defendant was attempting to elude detection, there were no signs limiting access to the parking lot, members of the public frequently used the area after the library was closed in order to use the book drop and to access the library's free Wi-Fi, the fact that crimes previously occurred nearby did not alter this conclusion, and S's observation that the defendant walked quickly toward his vehicle fell short of the type of flight that has been found to indicate criminal behavior.

State *v.* Haughwout

2. There was no merit to the defendant's claim that there was insufficient evidence to support his conviction of both counts of assault of a peace officer in connection with the second incident on the ground that the jury could not have reasonably found that the defendant had intended to interfere with the performance of either V's or D's duties or to cause D's injuries, and on the ground that the evidence did not support a finding that V's use of force was reasonable: the context afforded by the argument preceding the struggle at the police station, the defendant's attempt to leave the lobby, the fact that he kicked V multiple times, and the length of the struggle were facts from which the jury reasonably could have inferred that the defendant's resistance was undertaken with an intent to delay his arrest, and not the result of mere reflex; moreover, the evidence was sufficient to support the conclusion that V's use of force was reasonable, as V testified that he grabbed the defendant, who had been informed that he was under arrest, in order to prevent him from leaving the lobby and brought him to the ground only after the defendant began to struggle, V was outsized and alone at the moment the struggle began, and V never struck the defendant or resorted to the use of any type of weapon; furthermore, the jury could have reasonably concluded that the defendant injured D during the struggle, as D testified that he experienced neck and back pain as a result of the defendant's resistance and that he took time off from work to recover from those injuries.

3. The defendant was entitled to a new trial with respect to the count charging him with the assault of V, as the trial court improperly declined to instruct the jury that, to find the defendant guilty of that assault, it must first determine that V's use of force was reasonable, and, accordingly, the defendant was entitled to a new trial with respect to that count; nevertheless, the defendant could not prevail on his claim that the trial court committed reversible error by failing to instruct the jury, with respect to the charge relating to the assault of D, that the defendant's conduct must have been the proximate cause of D's injuries, as the trial court's instruction on causation was both legally correct and adequate when viewed in the context of the evidence presented at trial.

Argued February 24—officially released July 23, 2021*

*Procedural History*

Substitute information, in the first case, charging the defendant with the crimes of disobeying the direction of an officer while increasing the speed of a motor vehicle in an attempt to escape or elude an officer and interfering with an officer, and substitute information,

---

* July 23, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Haughwout

in the second case, charging the defendant with two counts of the crime of assault of public safety personnel and one count of the crime of interfering with an officer, brought to the Superior Court in the judicial district of Middlesex, where the cases were consolidated and tried to the jury before *Suarez, J.*; thereafter, the court, *Suarez, J.*, denied the defendant's motion to suppress certain evidence; subsequently, verdicts of guilty; thereafter, the court, *Suarez, J.*, vacated the conviction of interfering with an officer in the second case and rendered judgments of conviction on the remaining counts in both cases, from which the defendant appealed. *Affirmed in part*; *reversed in part*; *judgment directed in part*; *further proceedings*.

*Jennifer Bourn*, supervisory assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, and *Russell C. Zentner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Austin Grant Haughwout, appeals from judgments of conviction on charges arising from, respectively, two separate incidents between him and various officers of the Clinton Police Department in July, 2015. The defendant claims that evidence of certain events during the first incident, which occurred in the parking lot of a local library on the night of July 19, 2015, should have been suppressed because those events were the result of an unconstitutional investigatory detention. The state responds to this claim by arguing that, in light of the totality of the circumstances presented, the police had a reasonable and articulable suspicion that the defendant had been engaged in criminal activity and that an investigatory detention was, therefore, constitutional under *Terry* v.

State *v.* Haughwout

*Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).[1] We disagree with the state and, accordingly, reverse the trial court's judgment of conviction as to the offenses relating to the incident that occurred on July 19, 2015. The defendant also claims that his conviction of two counts of assault of public safety personnel, specifically a peace officer, related to the second incident, which occurred inside of the Clinton Police Department on July 22, 2015, is infirm because (1) the state's evidence was insufficient to support his conviction, and (2) the trial court erred when instructing the jury. The state concedes that a new trial is required with respect to one of the assault charges due to instructional error but contends that the defendant's remaining claims lack merit. We agree with the state and, therefore, affirm in part and reverse in part the trial court's judgment of conviction related to the incident that occurred on July 22, 2015.

The following facts and procedural history are relevant to our consideration of the present appeal. Shortly after 9 p.m. on the evening of July 19, 2015, Officer Alexieff Adrian Santiago drove past the Henry Carter Hull Library in the town of Clinton and observed a vehicle parked in an unlit corner of an adjacent parking lot.[2] Although the library had closed earlier that day, Santiago testified that the public frequented the parking lot after hours to use the book drop and to access the

_____

[1] Each of the charges related to this event stem from the defendant's refusal to comply with various orders by the police after his detention. In addition to his argument related to the motion to suppress, the defendant also argues that, if the initial detention was unconstitutional, he cannot legally be punished for ignoring the orders that followed.

[2] Santiago was conducting a routine patrol of the area in a marked police cruiser. Although Santiago testified that the library had been broken into once several years before and that a series of more recent larcenies had occurred at a nearby mall, the record contains no indication that the police had received any reports of crimes or other suspicious activity in the area on that particular evening.

State *v.* Haughwout

library's free Wi-Fi.[3] Santiago turned his police cruiser around, drove into the parking lot, and observed a person walking "quickly" in the direction of the parked vehicle.[4] A few moments later, that vehicle began to drive toward the exit of the parking lot.[5] Santiago turned his cruiser's light bar on briefly and then motioned with his hand for the approaching vehicle to pull alongside of his cruiser. Santiago immediately recognized the defendant and asked him what he had been doing there. The defendant responded that he had been using the library's Wi-Fi at a picnic table adjacent to the parking lot but had left because he was being bothered by bugs.[6]

Santiago then decided to look behind the library and ordered the defendant to put his vehicle in park. The defendant then began to ask, repeatedly and continuously, whether Santiago suspected him of a crime. Santiago responded by telling the defendant, at least two more times, to put the vehicle in park. The defendant ignored those commands and abruptly began to drive toward the exit of the parking lot. While Santiago was turning his cruiser around to pursue the defendant, he noticed that a fence gate leading to a patio behind the library was open.[7] Santiago then turned on his light bar,

---

[3] Numerous photographs of the parking lot admitted into evidence at trial depict no posted rules restricting access to the parking lot or any signage prohibiting trespassing.

[4] Santiago gave the following specific testimony on this point: "By the time I got back, I saw the person was quickly going to their car and pulling out of the parking space as I pulled in . . . ."

[5] At this point, the defendant began recording a video on a dashboard camera. That video recording, which ran for the duration of the relevant events that evening, was admitted into evidence at trial.

[6] Santiago testified that he was skeptical of this explanation because individuals who access the library's Wi-Fi from the parking lot typically park closer to the entrance of the library in order to get a stronger signal. Santiago also testified, however, that there were no picnic tables near the entrance and that, although the signal might not be strong enough for tasks like "web surfing or streaming," a connection from that location was still possible.

[7] The record contains conflicting evidence about precisely when Santiago first observed the open gate. At some points, Santiago testified that he

State *v.* Haughwout

pulled his cruiser up behind the defendant at the exit of the parking lot, and radioed for backup. The defendant stopped his vehicle, called out to Santiago by exclaiming, "hey asshole," and then continued to shout out of the window. As another officer arrived, the defendant pulled out of the parking lot and began to drive north on Killingworth Turnpike. The officers engaged their sirens and followed. Although the defendant came to a halt a short distance away, he thereafter continuously argued with the officers, refused to put the transmission of his vehicle into park, and repeatedly declined to provide his license and registration when requested. The police officers ultimately decided to let the defendant leave the scene and to apply for an arrest warrant based on his conduct.

On July 22, 2015, the police called the defendant and informed him that they had obtained a warrant for his arrest in connection with the preceding events. The defendant arrived at the police station at approximately 8 p.m. that evening. Prior to entering the police station, the defendant, using a small video camera, began a recording of the event by noting the date, time, location, and purpose of his visit and reviewing an inventory of items he was taking with him into the station. After entering the station, he was explicitly told by Officer Christopher Varone that he was in police custody and under arrest. At that time, Varone noticed that the defendant was carrying a small video camera and stated that, for safety reasons, it would not be allowed into the booking area. At least twice, Varone patiently stated that he would secure the device and return it after the defendant was released on a promise to appear. Varone

noticed the gate when he first entered the parking lot that evening. At other points, he testified that he had noticed the gate only after his initial conversation with the defendant. Although the trial court made no factual finding on this particular point, on appeal, the parties agree that Santiago's latter testimony reflects the actual sequence of events that evening.

State *v.* Haughwout

repeatedly indicated that, if the defendant did not comply, he would soon be forced to do so. During the course of this discussion, the defendant declined to give up the camera several times. At first, the defendant asserted that he needed to keep the camera for his own safety but then later stated that he was just going to leave the camera in the lobby. The defendant then walked a short distance away and placed his camera down on top of a display case. Varone told the defendant that the police department would not be responsible for the camera if the defendant chose to leave it in the lobby. Shortly thereafter, the defendant picked his camera back up and turned to leave the station, stating that he was going to secure the camera himself.

Varone grabbed the defendant in order to prevent him from leaving the station, the defendant resisted, and a struggle ensued. Varone forced the defendant to the floor while the defendant began kicking Varone repeatedly. Moments later, Officer James DePietro, Jr., ran into the lobby and joined the struggle in order to assist Varone. DePietro audibly ordered the defendant, who was still "flailing about," "kicking," and "struggling" at the time, to put his hands behind his back. The defendant refused to comply and was eventually restrained. The defendant then repeatedly ignored commands to get up off of the floor and walk on his own into the booking area. As a result, he was carried to the booking area with the assistance of additional officers.

The jury's understanding of the events in the lobby that day was informed by no less than three separate recordings: (1) a video from the camera in the defendant's hand, which had audio; (2) a video from a security camera in the lobby, which did not; and (3) an audio recording from a cell phone hidden inside of the defendant's pants. The defendant's camera was turned off shortly after DePietro joined the struggle in the lobby. The cell phone hidden in the defendant's pants recorded

State *v.* Haughwout

audio for the duration of the relevant events that day. The security camera recorded most of the events in the lobby, but was positioned at an angle that did not capture the portion of the incident that occurred after the defendant was on the floor. In addition, the evidence also included recordings from a camera in the booking area's cell block, which contain both video and audio, that show the defendant after he was carried out of the lobby.

Testimony offered at trial indicated that the defendant was about six feet tall and weighed approximately 160 pounds. Varone and DePietro were both physically smaller than the defendant. DePietro generally described the confrontation to the jury as follows: "It . . . just wasn't, you know, going to the ground and putting handcuffs on [the defendant]. It was a fight, a full on fight. And he's a little bigger than I am. But, even with . . . Varone and I, it was a full on fight." The defendant was eventually transported to a hospital by ambulance and then he was released back into the custody of the police. He was then taken back to the police station and processed without further incident.

Both Varone and DePietro sustained minor injuries that day. Specifically, Varone testified that the defendant had kicked him in the chest, face, and arm. Varone indicated that he experienced pain as a result of the kick to his arm, and a photograph was admitted into evidence showing light red bruising on the inside of his left bicep. Varone also testified that he injured one of his fingers while struggling with the defendant and that it went numb for a period of time. DePietro testified that his neck and back were "very sore from the fight" and that he ended up taking time off from work as a result.

The defendant was subsequently charged with various offenses for his conduct on both July 19 and July

State *v.* Haughwout

22, 2015. Specifically, with respect to the incident that started in the library parking lot, the defendant was charged with interfering with an officer in violation of General Statutes § 53a-167a (a) and disobeying the direction of an officer while increasing the speed of a motor vehicle in an attempt to escape or elude in violation of General Statutes § 14-223 (b). With respect to the altercation at the police department, the defendant was charged with two counts of assault of a peace officer in violation of General Statutes § 53a-167c (a), relating to Varone and DePietro, respectively, and an additional count of interfering with an officer in violation of § 53a-167a (a), which related only to DePietro.

The two informations were consolidated for trial, and the jury returned verdicts finding the defendant guilty on all counts. The trial court vacated the defendant's conviction as to the interfering charge in the second case on double jeopardy grounds. The trial court imposed separate sentences of one year of incarceration, execution suspended, and one year of probation in connection with both of the charges in the first case. As to each count alleging assault of a peace officer in the second case, the trial court imposed a sentence of seven years of incarceration, execution suspended after one year, and five years of probation. The trial court specified that all four of the sentences were to run concurrently for a total effective sentence of seven years of incarceration, execution suspended after one year, and five years of probation. This appeal followed.[8] Additional facts and procedural history will be set forth as necessary.

In the present appeal, the defendant claims that (1) evidence of his conduct on the evening of July 19, 2015,

[8] The defendant appealed to the Appellate Court from the judgments of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

should have been suppressed by the trial court because it was obtained as a result of an unconstitutional investigatory detention by the police, and (2) the judgment of conviction arising out of the events that occurred at the police station on July 22, 2015, should be reversed because of insufficient evidence and instructional error. We address these claims in turn.

I

We begin with the defendant's claim that the trial court improperly denied his motion to suppress evidence relating to the events of July 19, 2015. In support of this claim, the defendant argues that Santiago lacked a reasonable and articulable suspicion that he had been engaged in criminal activity. The state expressly conceded at oral argument before this court that a reasonable person in the defendant's position would have believed that he was not free to leave the parking lot once Santiago motioned for the defendant's vehicle to pull alongside of his cruiser and that, as a result, a seizure had occurred within the meaning of our state constitution. See, e.g., *State* v. *Oquendo*, 223 Conn. 635, 653, 613 A.2d 1300 (1992). The state further conceded at oral argument that, if this court were to conclude that the trial court erroneously denied the motion to suppress, that conclusion would be dispositive with respect to the conviction relating to the events of July 19, 2015. However, the state claims that the investigatory detention of the defendant was reasonable in light of the totality of the circumstances known to Santiago at the time. For the reasons that follow, we disagree with the state.

The following additional facts and procedural history are relevant to our consideration of this issue. Before trial, the defendant moved to suppress "any and all evidence, including electronic audio and video recordings, and any statements obtained from the defendant,

State *v.* Haughwout

that [derived from the] unlawful and unconstitutional seizure on July 19, 2015.'' In support of that motion, defense counsel argued that Santiago lacked a reasonable and articulable suspicion that the defendant had been engaged in criminal activity that evening. In response, the prosecutor argued that the defendant's presence in the parking lot, his movements after Santiago arrived, the explanation he subsequently gave for his presence, and the history of criminal activity in the area were sufficient to permit an investigative detention.

The trial court ultimately denied the defendant's motion to suppress, concluding, inter alia, that Santiago's initial orders were supported by a reasonable and articulable suspicion. In reaching this conclusion, the trial court reasoned: ''Santiago saw a vehicle, it was in a dark area of the public library, and after hours, saw an individual getting into the car. Based on his beliefs of prior criminal activity in that area, based on his knowledge as a police officer that criminal activity occurred at the . . . [mall] next door, he had a suspicion, a reasonable and [articulable] suspicion to approach the car and [ask the defendant] some questions.''

''Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .'' (Internal quotation marks omitted.) *State* v. *Davis*, 331 Conn. 239, 246, 203 A.3d 1233 (2019). The question of whether a particular set of facts gives rise to a reasonable and articulable suspicion is a question of law over which we exercise plenary review. Id., 246–47.

State *v.* Haughwout

"Under the fourth amendment to the United States [c]onstitution and article first, §§ 7 and 9, of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest. . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . .

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion. . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 297 Conn. 1, 9–10, 997 A.2d 461 (2010).

Our analysis in the present case is guided in particular by this court's decision in *State* v. *Santos*, 267 Conn. 495, 838 A.2d 981 (2004). In that case, police officers reported seeing four men pacing nervously back and forth in a dark parking lot at night and stated that one of them smelled of alcohol. Id., 505–506. Several municipal athletic fields adjacent to that parking lot remained open to the public after sunset, but the area

State *v.* Haughwout

was routinely patrolled at night because of previous criminal activity involving both drugs and prostitution. Id., 498. When questioned, the group of men told the police that they were " 'just driving around' " and that they had been wrestling with each other on the ground before the police arrived. Id., 499–500.

Although we acknowledged that the time of day and the history of criminal activity in an area can be relevant factors to consider in the course of such an analysis, we concluded that those factors alone were insufficient to create a reasonable suspicion that the defendant had been committing a crime. Id., 508–509, citing *Brown* v. *Texas*, 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979) ("[t]he fact that [the defendant] was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that [the defendant] himself was engaged in criminal conduct"); see also *State* v. *Scully*, 195 Conn. 668, 679 n.15, 490 A.2d 984 (1985) ("[t]he lesson from *Brown* . . . is simply that physical presence in a geographical area where the police may have reason to anticipate possible violations of the law does not in and of itself justify arbitrary investigatory stops").

Our decision in *State* v. *Donahue*, 251 Conn. 636, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000), reached the same conclusion. In that case, the state argued that the police had reasonable suspicion to detain a defendant after his vehicle made an abrupt, but legal, turn into an unlit parking lot at 1:50 a.m. Id., 639–41, 647. As in *Santos*, the state relied on testimony demonstrating that the social club next to that parking lot had already closed for the evening and that the surrounding area had recently experienced a rise in criminal activity. Id., 639, 641. The trial court in *Donahue* declined to suppress the evidence that was discovered as a result of that detention, concluding that "there's a reasonable and

State *v.* Haughwout

articulable suspicion that criminal activity was afoot when given the vicinity, the time of night the defendant pulls into the dirt parking lot of a club that is closed. And there's no other businesses in the area that could have been opened at that time. So I find that there was [a] reasonable suspicion to justify the stop at that time.'' (Internal quotation marks omitted.) Id., 641. This court reversed the judgment of the Appellate Court, which affirmed the trial court's judgment, concluding that the defendant's detention ''was based on nothing more than the location of the defendant's vehicle at an early hour of the morning.'' Id., 637, 645. In reaching that conclusion, we noted that the defendant had committed no traffic violations, had not engaged in furtive conduct of any kind, and that the vehicle was unconnected to any ongoing police investigations. Id., 647.

The reasoning of both *Santos* and *Donahue* compels the conclusion that the defendant's mere use of the library's parking lot and picnic table at 9 p.m. on a Sunday evening cannot, in and of itself, give rise to a reasonable and articulable suspicion of criminal activity. See, e.g., *State* v. *Edmonds*, 323 Conn. 34, 68, 145 A.3d 861 (2016) (''[i]t is well established that the fact that a citizen chooses to stand outside at the dinner hour, in a neighborhood plagued by crime, does not warrant any reasonable and articulable suspicion that he himself is engaged in criminal activity''). As previously stated in this opinion, there were no signs limiting access to the parking lot, and members of the public frequently used the area after the library was closed. The fact that crimes had previously occurred nearby; see footnote 2 of this opinion; does not alter this conclusion. See, e.g., *State* v. *Oquendo*, 223 Conn. 635, 655 n.11, 613 A.2d 1300 (1992) (''[a] history of past criminal activity in a locality does not justify suspension of the constitutional rights of everyone, or anyone, who

State *v.* Haughwout

may subsequently be in that locality'' (internal quotation marks omitted)).

The additional facts relied on by the state to demonstrate the existence of a reasonable and articulable suspicion are insufficient to warrant a different result. First, Santiago's observation that the defendant was walking quickly toward his vehicle is of limited value. Even if that movement was occasioned by Santiago's arrival, a point that is neither specifically resolved by the trial court's factual findings nor entirely clear from the record, it would still fall short of the type of headlong flight that has been found to be indicative of criminal behavior in other contexts. See, e.g., *State* v. *Edmonds*, supra, 323 Conn. 72–73 (''[t]he mere fact that a citizen turns and walks away from an approaching police officer does not . . . support a reasonable and articulable suspicion of criminality'' (emphasis omitted)); cf. *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). The totality of the circumstances presented in this case also do not objectively indicate that the defendant was attempting to elude detection. Cf. *State* v. *Wilkins*, 240 Conn. 489, 493, 692 A.2d 1233 (1997) (ducking down in car to avoid being seen by police); *State* v. *Januszewski*, 182 Conn. 142, 144–45, 438 A.2d 679 (1980) (avoiding police by crawling out of passenger door of vehicle and under adjacent motorcycle) (overruled in part on other grounds by *State* v. *Hart*, 221 Conn. 595, 609, 605 A.2d 1366 (1992)), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); *State* v. *Watson*, 165 Conn. 577, 581, 585–86, 345 A.2d 532 (1973) (four individuals exiting vehicle behind closed restaurant and, minutes later, hurrying out from behind adjacent establishment to reenter same vehicle), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974). Indeed, after returning to his vehicle, the defendant sat, stationary, for several moments in order to set up his dashboard camera and then promptly

State *v.* Haughwout

brought his vehicle to a stop when signaled to do so by Santiago.

Santiago's initial reaction to the defendant's explanation that he had been using the library's Wi-Fi also does little to support the state's position given that Santiago himself recognized that members of the public frequently used the parking lot after hours for that exact purpose. Further, Santiago acknowledged that the Wi-Fi signal could well have been strong enough at the picnic tables for at least some purposes.[9] In light of these facts, we see no reason to conclude that the defendant's explanation for his presence was any more suspicious than the ones given to the police in *Santos*.[10]

In sum, Santiago's suspicion appears to have been based principally on the fact that the defendant happened to be present in the library parking lot at night and began to leave when Santiago arrived. Our precedent firmly establishes that such factors are, without more, insufficient to support a reasonable and articulable suspicion that criminal activity was afoot. Consequently, we conclude that the defendant's detention was unlawful and that, as a result, the trial court improperly denied his motion to suppress. The state has conceded, for the purpose of the present appeal, that this conclusion forecloses the imposition of criminal liability for the conduct that followed during the investigatory stop on July 19, 2015. The judgment of conviction as to the

[9] Although the defendant may not have parked in the same spot typically used by other Wi-Fi users, it is undisputed that he was still located on the side of the parking lot closest to the library and that the picnic tables were only approximately thirty feet away from the building. There is also no indication in the record that the defendant would have known that a stronger signal might have been available at another location.

[10] Because the parties agree that Santiago was unaware of the open fence gate when he seized the defendant; but see footnote 7 of this opinion; we need not consider that fact in our analysis. See *State* v. *Clark*, supra, 297 Conn. 9–10.

State *v.* Haughwout

charges of interfering with and disobeying an officer related to that conduct, therefore, cannot stand.

II

The defendant's remaining claims of error relate to the two counts of the information in the second case alleging assault of a peace officer, which concerned the confrontation between the defendant, Varone, and DePietro that occurred at the Clinton Police Department on July 22, 2015.[11] The defendant argues that there was insufficient evidence to support either of those charges and that the trial court improperly declined to instruct the jury as to both counts. For the reasons that follow, with the exception of the claim of instructional error as to the assault count relating to Varone, we reject these claims.

A

Sufficiency Claims

The defendant raises three distinct claims relating to the sufficiency of the state's evidence. First, the defendant argues that he is entitled to a judgment of acquittal on both of the assault charges in the second case because the jury, based on the evidence presented at trial, could not have reasonably found that the defendant intended to interfere with the performance of either Varone's or DePietro's duties. Second, the defendant claims that his conviction for assaulting Varone must, likewise, be reversed because there was insufficient evidence to show that Varone's use of force was reasonable.[12] Finally, the defendant claims that his con-

---

[11] As noted previously in this opinion, the trial court vacated the defendant's conviction of interfering with DePietro in violation of § 53a-167a (a) on double jeopardy grounds prior to sentencing.

[12] Although the state has conceded that the defendant's conviction with respect to the assault on Varone must be reversed because of instructional error, we must still address the defendant's first two sufficiency claims because they would, if successful, entitle him to a judgment of acquittal on that charge. See, e.g., *State* v. *Padua*, 273 Conn. 138, 178, 869 A.2d 192 (2005) ("sound appellate policy and fundamental fairness require a reviewing court

State *v.* Haughwout

viction for assaulting DePietro must be reversed because the jury could not have reasonably concluded that he had caused DePietro's injuries. The state disagrees with each of these claims, arguing that the various video recordings of the event and the testimony offered by the two officers at trial were sufficient to support the defendant's conviction. We agree with the state and conclude that the defendant's sufficiency claims lack merit.

The relevant standard of review is well established. "When reviewing a sufficiency of the evidence claim, we do not attempt to weigh the credibility of the evidence offered at trial, nor do we purport to substitute our judgment for that of the jury. . . . [W]e construe the evidence in the light most favorable to sustaining the verdict . . . . We then determine whether the jury reasonably could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt. . . . [W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Lamantia*, 336 Conn. 747, 755, 250 A.3d 648 (2020); see also *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994) ("[w]e do not sit as the 'seventh juror' when we review the sufficiency of the evidence"). "A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden." (Internal quotation marks omitted.) *State* v. *Rhodes*, 335 Conn. 226, 233, 249 A.3d 683 (2020).

In order to prove a violation of § 53a-167c (a) (1), the state must establish that the defendant "(1) inten[ded]

_____

to address a defendant's insufficiency of the evidence claim prior to remanding a matter for retrial because of trial error").

State *v.* Haughwout

to prevent (2) a reasonably identifiable officer (3) from performing his duty (4) by causing physical injury to such officer . . . .'' *State* v. *Flynn*, 14 Conn. App. 10, 21, 539 A.2d 1005, cert. denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988); see also *State* v. *Casanova*, 255 Conn. 581, 592, 767 A.2d 1189 (2001), overruled in part on other grounds by *State* v. *Brocuglio*, 264 Conn. 778, 826 A.2d 145 (2003). ''If [a] police officer does not reasonably believe that his use of physical force is necessary, then his use of force is not within the performance of his duties and a citizen may properly resist that use of force.'' *State* v. *Davis*, 261 Conn. 553, 570–71, 804 A.2d 781 (2002).

The defendant first claims that no jury could reasonably conclude that he possessed an intent to prevent Varone and DePietro from performing their duties. Specifically, the defendant contends that the evidence presented at trial could reasonably support a finding only that he had panicked and lost control.[13] We disagree. The context afforded by the argument preceding the fight, the defendant's attempt to leave the lobby, the number of times he kicked Varone, and the overall length of the struggle that followed are all facts from which the jury could have reasonably inferred that the defendant's resistance was undertaken with an intent to delay his own arrest and not mere reflex. See, e.g., *State* v. *Porter*, 76 Conn. App. 477, 490–91, 819 A.2d 909 (sufficient evidence of intent to interfere with duties of officer in case in which defendant responded to attempted arrest by struggling with officer and striking him in face and shoulder) (overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013)), cert. denied, 264 Conn. 910, 826 A.2d 181 (2003).

---

[13] We observe that defense counsel also made this particular argument during the course of closing arguments and that, in returning verdicts finding the defendant guilty, the jury implicitly rejected it.

State *v.* Haughwout

The defendant's next claim is that the evidence admitted at trial was insufficient to support a conclusion that Varone's use of force was reasonable. Again, we disagree. Varone testified that he initially grabbed the defendant in order to prevent him from leaving the lobby and that he brought the defendant to the ground only after the defendant began to struggle in response.[14] The police had obtained an arrest warrant for the defendant, and, as stated previously in this opinion, Varone had already told the defendant multiple times that he was under arrest and in the custody of the police. Varone repeatedly offered to secure the camera for the defendant and to return it to him after he was processed and released on a promise to appear. At the moment the struggle began, Varone was outsized and alone. The testimony and exhibits offered at trial indicate that Varone never struck the defendant or resorted to the use of any type of weapon. These facts, although perhaps not conclusive, would have been sufficient to allow a properly instructed jury to conclude that Varone's decision to physically prevent the defendant from leaving the lobby and his decision to bring the defendant to the ground during the course of the struggle that followed were both reasonable when considered in context.

The defendant's final sufficiency claim is that the jury could not have reasonably concluded that he caused injuries to DePietro. This argument is adequately disposed of by DePietro's testimony that he experienced neck and back pain as a direct result of the defendant's resistance and that he took time off from work to

---

[14] The defendant's briefing appears to assume that Varone's decision to prevent the defendant's egress and his decision to bring the defendant to the ground were made simultaneously. Although the various recordings admitted into evidence undoubtedly show a rapid progression of events, the jury reasonably could have credited Varone's specific testimony to the contrary.

State *v.* Haughwout

recover from that injury.[15] See General Statutes § 53a-3 (3) (" '[p]hysical injury' means impairment of physical condition or pain"); *State* v. *Cruz*, 71 Conn. App. 190, 214–15, 800 A.2d 1243 (concluding that definition of physical injury under § 53a-3 (3) applies to charge of assault of peace officer under General Statutes (Rev. to 1997) § 53a-167c), cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002); see also Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-3 (West 2007), commission comment (noting that statutory definition of physical injury is "intentionally broad"). Neither the absence of an observable physical condition nor the delayed onset of pain requires the conclusion that the state's evidence was insufficient to support the defendant's conviction.[16]

[15] The full colloquy between DePietro and the prosecutor reads as follows:

"Q. Now, as a result of this you were assisting . . . Varone did you, yourself, sustain any kind of an injury or any kind of pain, anything of that nature?

"A. Well, the next day, when I came into work, I had some neck pain and some back pain, I was very sore from the fight. It . . . just wasn't, you know, going to the ground and putting handcuffs on [the defendant]. [I]t was a fight, a full on fight. And he's a little bigger than I am. But even with . . . Varone and I, it was a full on fight. And the next day, you know, I was sore. My neck hurt and my back hurt.

"Q. Okay. And how long . . . did your back hurt you?

"A. Oh, I reported to Sergeant Dunn the next day that I was having the pain. Then I went into my days off, and I ended up taking one extra day off, which was a Sunday before I returned to work.

"Q. Because of the pain?

"A. Oh, yes, because of the pain."

[16] The defendant's initial briefing of this sufficiency claim focused on the issue of whether the state had proven a type of injury punishable under § 53a-167c, arguing that an interpretation of physical injury that encompasses an officer who merely feels "sore" would "lead to absurd and unworkable results . . . ." The state's brief responded in kind. In his reply brief, the defendant contended that his sufficiency claim with respect to DePietro had also focused on the issue of whether the defendant's *own volitional acts* had caused DePietro's injuries. Even if this latter claim had been raised distinctly in the context of the defendant's initial sufficiency argument, which it was not, we would reject it. DePietro testified that he was injured during the course of the fight itself; see footnote 15 of this opinion; and, as discussed previously, the jury could have reasonably concluded that the

State *v.* Haughwout

See, e.g., *State* v. *Downey*, 69 Conn. App. 213, 217, 796 A.2d 570 (2002) (pain caused by kick to officer's leg was sufficient to support conviction); *State* v. *Mims*, 61 Conn. App. 406, 408–409 and n.2, 764 A.2d 222 (pain caused by kick to officer's left testicle was sufficient to support conviction notwithstanding fact that injured officer sought no medical attention and took no time off from work), cert. denied, 255 Conn. 944, 769 A.2d 60 (2001); *State* v. *Henderson*, 37 Conn. App. 733, 743– 44, 658 A.2d 585 (testimony that victim experienced pain after being struck by defendant in her chest was sufficient evidence of physical injury to support conviction of third degree assault), cert. denied, 234 Conn. 912, 660 A.2d 355 (1995).

B

Instructional Error Claims

The defendant raises two separate claims of instructional error. First, with respect to the charge relating to the assault on Varone, the defendant claims that the trial court erred in failing to instruct the jury that, in order to find him guilty of that offense, it must first determine that Varone's use of force was reasonable. Second, with respect to the charge relating to the assault on DePietro, the defendant claims that the trial court improperly declined to instruct the jury that the defendant's conduct must have been the proximate cause of DePietro's injuries. We set forth the relevant standard of review and then address the defendant's two claims in turn.

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation . . . but must be viewed in the context of the overall charge.

---

defendant had engaged in that struggle with the conscious purpose of delaying his own arrest.

State *v.* Haughwout

. . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury. . . . A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review.'' (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 528–29, 180 A.3d 882 (2018).

We begin with the first claim of instructional error, relating to the count of assault on Varone. On February 23, 2021, this court issued an order granting the defendant permission to file a supplemental brief addressing this additional claim of instructional error. In his supplemental brief filed pursuant to that order, the defendant claimed that the trial court improperly declined his request to instruct the jury as to whether it found that Varone's use of force was reasonable. See, e.g., *State* v. *Davis*, 261 Conn. 553, 570–71, 804 A.2d 781 (2002) (''If [a] police officer does not reasonably believe that his use of physical force is necessary, then his use of force is not within the performance of his duties and a citizen may properly resist that use of force. . . . [A] detailed instruction that the state must establish that the police officer had been acting in the performance of his duty and that a person is not required to submit to the unlawful use of physical force during the course

of an arrest, whether the arrest itself is legal or illegal, stands in lieu of a self-defense instruction in such cases. . . . [T]he failure to provide such instructions when the defendant has presented evidence, no matter how weak or incredible, that the police officer was not acting in the performance of his duty, effectively operates to deprive a defendant of his due process right to present a defense.''). The state, in response, concedes that the trial court committed reversible error by omitting the requested instruction. Having reviewed the record, we agree with the parties and conclude that, as a result, the defendant is entitled to a new trial with respect to the assault on Varone charged in the first count of the information in the second case.

The defendant's second claim of instructional error relates to the charge arising out of the assault on DePietro. In particular, the defendant claims that the trial court committed reversible error by failing to specifically instruct the jury that, in order to find the defendant guilty of assault of a peace officer, as alleged in the second count of the information in the second case, the defendant's conduct must have been the proximate cause of DePietro's injuries. The state responds by arguing that the instruction given by the trial court on the topic of causation was both legally correct and adequate when viewed in the context of the evidence presented at trial. For the reasons that follow, we agree with the state.

The following additional procedural history is relevant to our consideration of this issue. The defendant submitted a request to charge on the counts of the information in the second case alleging assault of a peace officer. That proposed instruction indicated that the state bore the burden of demonstrating not only that the defendant's conduct caused the injuries to DePietro's neck and back, but also that the defendant's

State *v.* Haughwout

conduct "was the proximate cause" of those injuries.[17] The trial court declined that request.

The trial court ultimately provided the following general instruction with respect to the first two counts of the information in the second case: "[A] person is guilty of assault of a peace officer when, with intent to prevent a reasonably identifiable peace officer from performing his duties and while such said peace officer was acting in the performance of his duties, such person caused physical injury to the peace officer." In a series of more specific instructions that followed, the trial court expressly informed the jury that the state bore the burden of proving that (1) "the defendant . . . caused physical injury to [DePietro]," and (2) the conduct specifically intended to prevent the performance of DePietro's duties must have been accomplished "by means of causing physical injury to [DePietro]."[18] We note that this language mirrors the relevant model criminal instruction. See Connecticut Criminal Jury Instructions 4.3-3, available at https://www.jud.ct.gov/JI/Crimi nal/Criminal.pdf (last visited July 22, 2021).

Although the briefing on the question is not entirely clear, the defendant appears to contend that the jury could have possibly been misled in at least two distinct ways. First, the defendant argues that the trial court's instructions "virtually eliminated" the element of causation and that, as a result, the jury was given a false

[17] The defendant's proposed instruction on causation provided: "It is necessary . . . that the defendant's conduct is the cause without which the injury would not have occurred and the predominating cause or the substantial factor from which the injury follows as a natural direct and immediate consequence. In other words, the state must prove that [the defendant's deliberate conduct] . . . was the proximate cause of the [injury claimed]."

[18] The trial court's initial recitation of this instruction related to the first count of the second information, which alleged that the defendant had assaulted Varone. The trial court's instructions on the second count of that same information, which related to the assault on DePietro, simply referred the jury back to the instructions previously provided.

State *v.* Haughwout

impression that DePietro's injuries need not have actually been connected to the defendant's conduct in any way. (Internal quotation marks omitted.) In support of this argument, the defendant has hypothesized that DePietro's injuries could have been caused by "shoveling snow" or "sleeping wrong." (Internal quotation marks omitted.) This argument is completely without merit. The court's charge, set forth previously in this opinion, clearly required the state to prove beyond a reasonable doubt that "the defendant . . . caused physical injury to [DePietro]."

Reduced to its essence, the defendant's principal argument on the point appears instead to be that, in the absence of the requested instruction on proximate causation, the jury was effectively relieved of the need to consider whether DePietro's injuries were a sufficiently direct result of an action undertaken with the requisite specific intent. We reject this argument as well. The trial court expressly instructed the jury that the specific intent required by the statute—namely, an intent to prevent DePietro from performing his duties—must have been effectuated "by means of causing physical injury to [DePietro]." In light of this instruction, we perceive no reasonable possibility that the jury could have been misled to believe that an injury caused without the required intent would suffice.[19] For the foregoing reasons, we conclude that the trial court's instructions, viewed as a whole, fairly presented the issues raised

---

[19] Even if some ambiguity remained on the point, the defendant still would not have been entitled to a more detailed instruction on causation because the evidence actually adduced at trial did not sufficiently develop an alternative theory of causation. Although testimony offered during the state's case-in-chief established that DePietro, together with the assistance of multiple other officers, had helped to move the defendant after the struggle in the lobby, the defendant made no attempt—through cross-examination or otherwise—to suggest that this activity had actually been the source of DePietro's injuries. Defense counsel's questioning of DePietro focused, instead, on the question of whether those injuries existed at all.

State *v.* Haughwout

at trial and that, therefore, there is no reasonable possibility that the jury was misled. As a result, the defendant's claim of instructional error with respect to this charge must fail.[20]

In summary, we conclude that the trial court incorrectly concluded that Santiago possessed a reasonable and articulable suspicion to detain the defendant in the library parking lot on the evening of July 19, 2015. As a result of the state's concession that this conclusion is dispositive, the defendant is entitled to a judgment of acquittal on the two counts charged in the information in the first case. Because the state has also conceded the existence of a reversible instructional error with respect to the charge related to the defendant's assault on Varone, the defendant is entitled to a new trial on the first count of the information in the second

_____

[20] In the closing pages of his principal brief, the defendant identifies a series of thirteen allegedly improper statements made by the prosecutor during the course of closing arguments. Of those, only four relate to the events that occurred in the lobby of the police department. In three of those four statements, the prosecutor simply prefaces an argument that the actions taken by the police that day were reasonable with the phrase, "I respectfully submit" or other language to the same effect. The state bore the burden of proving the point; see, e.g., *State* v. *Davis*, supra, 261 Conn. 570–71; and each of these three particular statements appears to reference only evidence contained within the record. Viewed in context, we do not believe that these remarks can be fairly characterized as a form of unsworn testimony. See, e.g., *State* v. *Luster*, 279 Conn. 414, 436, 902 A.2d 636 (2006). The singular comment that remains is a statement in which the prosecutor argued to the jury that the defendant would have been aware of the policy prohibiting the retention of personal effects in the booking area because he had previously reviewed the Clinton Police Department's manual pursuant to a freedom of information request. The defendant's briefing, however, contains no analysis as to how this particular comment, as distinct from his broader allegations that the prosecutor was "vouching" for the reasonableness of the conduct of the police, deprived him of his due process right to a fair trial. As a result, we conclude that the claim of prosecutorial impropriety with respect to that statement was inadequately briefed. See, e.g., *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" (internal quotation marks omitted)).

O'Shea *v.* Scherban

case. Having concluded that the defendant's various claims with respect to the assault on DePietro lack merit, the conviction on the second count of assault in the second case must stand.

The judgment of conviction in the case relating to the events of July 19, 2015, is reversed and that case is remanded with direction to render a judgment of acquittal on all counts charged in that information; the judgment of conviction in the case relating to the events of July 22, 2015, is reversed only with respect to the count pertaining to the assault on Varone, and the case is remanded for a new trial with respect to that count; the judgment of conviction in the case relating to the events of July 22, 2015, is affirmed with respect to the count pertaining to the assault on DePietro.

In this opinion the other justices concurred.

———————————

STEPHANIE O'SHEA *v.* JACK SCHERBAN ET AL.
(SC 20542)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The plaintiff, who had run in the November, 2020 election to fill a vacant position on the Board of Education of the City of Stamford, appealed to the trial court, seeking to compel the defendants, including various city election officials, to seat her as a member of the board after she received the most votes for the position and the city determined that the vacant position had been included on the election ballot in error and declined to credit the election result. Pursuant to the applicable provisions (§ C1-80-2 (b) and (c)) of the Stamford charter, the city's Board of Representatives appointed the defendant H in February, 2020, to fill the vacancy until the next biennial election in November, 2021. In October, 2020, after ballots for the November, 2020 election were printed and sent to absentee voters, and the plaintiff and other individuals had registered as write-in candidates, the city discovered that the vacant board position had been placed on the ballot in error. City officials then met with the plaintiff and the other candidates to discuss the city's determination that, under § C1-80-2, biennial elections are held in odd

O'Shea *v.* Scherban

numbered years rather than in even numbered years and that H had been appointed to fill the vacant position until the next biennial election. The city further determined that it would be confusing to voters to print and distribute corrected ballots, given the short period of time before the election, and, thus, the election for the vacant position proceeded. The trial court rendered judgment for the defendants, concluding that the city charter unambiguously provided that H's appointment by the Board of Representatives placed her in the vacant position until the next biennial election in 2021. On appeal, the plaintiff claimed that the city was required to hold an election in November, 2020, to fill the vacancy on the board for the balance of the vacated term. She asserted, inter alia, that the term "biennial election" in § C1-80-2 should be construed to mean "the next town election" and that to construe "biennial election" to mean elections held in odd numbered years would violate various provisions of the federal and state constitutions. *Held*:

1. The plaintiff's claim that the term "biennial election" in § C1-80-2 should be construed to mean "the next town election" was unavailing, as that term refers to elections for vacant positions occurring every other year, which, in Stamford, are the odd numbered years: although the city charter did not define "biennial" and § C1-80-2 (c) did not specify whether the term "next biennial election" means even numbered years or odd numbered years, it was clear from looking at a related provision (§ C1-70-1) of the charter, which required elections to occur biennially beginning in 1953, that biennial elections were to occur in odd numbered years, and that conclusion was supported by the statutory (§ 9-164 (a)) requirement that municipal elections are to be held biennially; moreover, the requirement of the city charter's savings provision (§ C1-40-2) that the charter be construed in harmony with state statutory law did not compel the conclusion that the vacant board position was required to be filled at the next city election, as the relevant statute (§ 9-220) requiring vacancies to be filled at the next town election or at a special election allowed for other arrangements "as otherwise provided by law," and § C1-80-2 clearly provided otherwise; furthermore, contrary to the plaintiff's claim, a city charter provision that required a different schedule for vacancy elections than for regular elections would not yield absurd or unworkable results, and the doctrine of constitutional avoidance was inapplicable, as the charter was not genuinely susceptible to two constructions, and its plain meaning did not raise serious constitutional questions.

2. The plaintiff could not prevail on her claims that the first amendment to the United States constitution required the city to hold an election for the vacant board position at the next regularly scheduled city election, that is, in November, 2020, and that the city's failure to count and validate the votes for the position in the 2020 election unconstitutionally disenfranchised her: the plaintiff failed to clearly articulate a specific constitutional claim, and, insofar as she claimed that the city charter's

O'Shea *v.* Scherban

vacancy election provision, which required skipping the city's next regularly scheduled election at which a full-term board position would be on the ballot, was unconstitutional, it was well established that municipalities have vast leeway in the management of their internal affairs, including the flexibility to decide whether members of boards of education are elected or appointed; moreover, the federal constitution permits some delay in the holding of vacancy elections, and the plaintiff presented no authority to support her assertion that delaying the holding of a vacancy election until the next biennial election was unconstitutional; furthermore, the plaintiff's claim that she would be unconstitutionally disenfranchised unless the votes were counted and the result honored was unavailing, as the plain language of the charter made clear that no valid election could have been held, and this court was aware of no authority that constitutional principles required this court to validate a void election.

3. The plaintiff did not demonstrate that the state constitution required vacant board positions to be filled by an election, as opposed to appointment, as soon as possible, as the plaintiff advanced no authority and engaged in no analysis suggesting that the constitutional text or Connecticut or federal precedent supported her claim, and the state constitution contains no provision pertaining to the vacancy at issue.

4. There was no merit to the plaintiff's claim that the doctrine of municipal estoppel required the defendants to count the votes that were cast for the vacant board position: the plaintiff could not show that she would be subjected to a substantial loss if the votes were not counted because, under the city charter, there was no election in which she could run and, thus, no seat to lose; moreover, the plaintiff could not show that she lacked or had no convenient means of acquiring knowledge of the true state of things, as she could have avoided any harm that resulted from her misapprehension of the city charter by reading it or asking the city for clarification before registering as a write-in candidate, and the plaintiff had actual knowledge of the true state of affairs in October, 2020, when city officials met with her and other candidates after discovering that the vacant board position had been placed on the ballot in error.

Argued January 21—officially released July 26, 2021*

*Procedural History*

Action seeking a writ of mandamus compelling the defendants to seat the plaintiff as a member of the Board of Education of the City of Stamford, and for other relief, brought to the Superior Court in the judicial

* July 26, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

district of Stamford-Norwalk, where the court, *Genuario, J.*, granted the motion filed by Joshua A. Esses to intervene; thereafter, the case was tried to the court; judgment for the defendants, from which the plaintiff appealed. *Affirmed*.

*Brenden P. Leydon*, for the appellant (plaintiff).

*Aaron S. Bayer*, with whom was *Jenny R. Chou*, for the appellees (named defendant et al.).

*Proloy K. Das*, with whom was *Kevin W. Munn*, for the appellee (defendant Rebecca Hamman).

*Maura Murphy Osborne*, assistant attorney general, for the appellee (defendant Denise Merrill).

*Joshua A. Esses*, self-represented, the appellee (intervenor).

*Opinion*

D'AURIA, J. In this appeal, we must construe a Stamford Charter (charter) provision that controls the filling of vacancies on the Board of Education of the City of Stamford (board) and consider claims that, as applied to the circumstances of this case, both the provision generally and the actions of election officials specifically violate the federal and state constitutions. The plaintiff, Stephanie O'Shea, wanted to run in the November, 2020 election to fill a vacancy on the board and claims that she in fact ran in that election, won it and should be serving on the board presently. She brought suit when the city's election officials refused to credit the election results on the ground that the charter provides that the election to fill the vacancy could not be held until the "next biennial election" in 2021. Stamford Charter § C1-80-2 (b). She appeals from the judgment of the trial court rendered in favor of the defendants,

O'Shea *v.* Scherban

who are various city election officials and the secretary of the state.[1]

The charter contains two provisions that control the filling of vacancies in elective office. In the first instance, § C1-80-2 (b) of the charter provides that, when a vacancy occurs "in any elective office and no specific provision for filling such vacancy is made in this [c]harter, the Board of Representatives shall, within sixty (60) days following the vacancy, elect a successor to fill such vacancy until December first following the next biennial election." Stamford Charter § C1-80-2 (b). Section C1-80-2 (c) provides in relevant part: "When the Board of Representatives has elected a successor to fill a vacancy in the office of Mayor, on the Board of Representatives, on the Board of Finance or on the Board of Education as set forth above in [§] C1-80-2 (b), then and in that event, a vacancy election shall be held at the next biennial election. . . ." Stamford Charter § C1-80-2 (c). On appeal, the plaintiff contends that we should construe the phrase, "next biennial election," to mean "next city election." She also claims that, if next "biennial election" is held to mean elections held in odd numbered years, then § C1-80-2 (c) violates the first amendment to the United States constitution and article first, §§ 1, 2, 4, 5, 8, 14 and 20, as well as article sixth, § 4, of the Connecticut constitution. In addition, the plaintiff argues that the defendants' actions in refusing to count the votes cast for the vacant position in November, 2020, were unconstitutional under the first amendment

_____

[1] The defendants are Lucy F. Corelli, in her official capacity as Republican registrar of voters; Ronald Malloy, in his official capacity as Democratic registrar of voters; Lyda Ruijter, in her official capacity as city and town clerk; Jack Scherban, in his official capacity as head moderator; and Denise Merrill, secretary of the state. The defendant Rebecca Hamman, in her official capacity as a member of the board, filed a separate brief. Intervenor Joshua A. Esses, who registered as a write-in candidate, also filed a separate brief. We refer in this opinion to Corelli, Malloy, Ruijter, Scherban and Merrill as the defendants, and to Hamman individually by name.

O'Shea *v.* Scherban

to the United States constitution. Finally, she claims that the doctrine of municipal estoppel should apply to prevent the defendants from refusing to count the votes.[2] We disagree with the plaintiff and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history, as stipulated by the parties, contained in the record, and found by the trial court, are relevant to this appeal. The charter provides for nine board members, with three positions up for election each year for three year terms. Stamford Charter § C1-80-5. In November, 2018, voters elected Frank Cerasoli and two other candidates to three year positions on the board. The term for Cerasoli's position ran from December 1, 2018, through November 30, 2021. Cerasoli vacated his position in January, 2020. Pursuant to § C1-80-2 (b) of the charter, in February, 2020, the city's Board of Representatives appointed the defendant Rebecca Hamman to fill the seat Cerasoli vacated, and she has served in that position since then.

By early October, 2020, ballots were printed for the November 3, 2020 election. The ballots included offices for president of the United States, United States representative, state senator, state representative, registrar of voters, three full-term Board of Education positions, and "Board of Education To Fill Vacancy for One Year." The board vacancy position did not have any party endorsed candidates. The ballots were sent to absentee voters.

The plaintiff registered as a write-in candidate for the board vacancy position on October 5, 2020. Hamman and the intervenor, Joshua A. Esses, also registered as

---

[2] The plaintiff also claims that the defendant Rebecca Hamman, a member of the board, and the intervenor, Joshua A. Esses, both write-in candidates for the vacant position that was placed on the ballot, are barred from seeking to void an election in which they participated. Because other claims by the plaintiff are dispositive, we do not reach this issue.

O'Shea *v.* Scherban

write-in candidates. On October 8, 2020, Stamford voter Eric Rota submitted an absentee ballot that included a vote for the plaintiff for the board vacancy position.

After questions were raised in the media regarding whether the ballot should have included the board vacancy position, the town clerk asked the city's corporation counsel, Attorney Kathryn Emmett, for an opinion on whether an election should take place for the position. On October 16, 2020, the mayor, David R. Martin, and Attorney Emmett met with the plaintiff, the party endorsed candidates for the three full-term board positions, and others. During that meeting, Mayor Martin discussed Attorney Emmett's conclusion that, under the charter, there could be no election for the position in 2020 and that the position had been included on the ballot in error. Mayor Martin also discussed the city's view that, because overseas and military ballots had already been printed and mailed, it would be problematic and confusing to voters to print and distribute corrected ballots given the short period of time before the election.

The same day, Attorney Emmett issued a legal opinion concluding that, under § C1-80-2 of the charter, "after the Board of Representatives has elected a successor to fill the vacancy . . . a vacancy election shall be held at the next biennial election" and that "biennial elections are held in odd-numbered years." The opinion concluded by stating that "there is currently no one (1) year term vacancy to fill on the Board of Education because Rebecca Hamman has been elected by the Board of Representatives to fill the partial term seat until the 2021 biennial election."

On October 20, 2020, Attorney Emmett participated in a conference call with Director of Elections Theodore Bromley and Staff Attorney Aida Carini, both from the Office of the Secretary of the State (secretary). Bromley

O'Shea *v.* Scherban

and Attorney Carini informed Attorney Emmett that the secretary would not require the city to reprint the ballots and that the secretary would not take a position on whether there was a valid election for the board vacancy position because that was a question of municipal law. Bromley and Attorney Carini also indicated that, given Attorney Emmett's conclusion that there was no valid election for the position, the secretary expected that the city would report no election results for that position.

On October 21, 2020, Mayor Martin and Attorney Emmett met again with the plaintiff, party endorsed candidates for the three year positions on the board, and others. At this meeting, Mayor Martin informed the participants that the ballots would not be reprinted and related that the secretary expected that the city would report no election results for the board vacancy position.

On November 5, 2020, the following numbers of votes for the board vacancy position were reported in the secretary's election management system: Esses, 2; Hamman, 21; and O'Shea, 578.[3] Nonetheless, on November 9, 2020, the city's head moderator, defendant Jack Scherban, submitted a final report and certification of votes to the secretary that did not include any votes for the position.

The plaintiff brought this action pursuant to General Statutes § 9-328, claiming that the charter, either by its terms or by a construction consistent with various federal and state constitutional provisions, required the city to hold an election in November, 2020, to fill the vacancy for the balance of the vacated term. The defendants contended to the contrary that the charter unambiguously provides that Hamman's appointment by the Board of Representatives filled the vacated position

[3] The four candidates for the three full-term board seats on the ballot received between 22,190 and 35,252 votes each.

O'Shea *v.* Scherban

until November 30, 2021. The trial court held that the charter provisions clearly and unambiguously provided that Hamman's appointment by the Board of Representatives placed her in the vacancy position until November 30, 2021.

The trial court rendered judgment in favor of the defendants, and the plaintiff appealed to the Appellate Court. We then transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Following oral argument, we issued a ruling from the bench on January 21, 2021, affirming the trial court's judgment. We indicated at that time that a full opinion would follow. This is that opinion.

I

The plaintiff first claims that we should construe the term "biennial election" in § C1-80-2 of the charter to mean "the next town election." We disagree. The term "biennial election" unambiguously refers to elections occurring every other year, which, in Stamford, are the odd numbered years.

The plaintiff does not argue that the term "biennial election" is ambiguous. Rather, she contends that, at the time the charter was written, the phrases "biennial election" and "the next town election" were interchangeable because the city held no elections in the intervening years. This fact, she argues, demonstrates original legislative intent, and we, therefore, should construe the charter consistent with this intent. The plaintiff further argues that interpreting "biennial election" to mean "the next town election" is necessary to harmonize the charter with General Statutes § 9-220.[4] Finally,

_____

[4] General Statutes § 9-220 provides: "If any town office in any town is vacant from any cause, such town, if such office is elective, shall, except as otherwise provided by law, fill the vacancy at the next town election or at a special election called for such purpose in accordance with the provisions of section 9-164, but, until such vacancy is so filled, it shall be filled by the selectmen. The selectmen shall fill all vacancies in offices to which they have the power of appointment."

the plaintiff argues that such a construction is necessary to avoid first amendment and fourteenth amendment due process concerns. We address each of these claims in turn, applying General Statutes § 1-2z and our familiar principles of statutory construction to the charter provisions. See *Russo* v. *Waterbury*, 304 Conn. 710, 720, 41 A.3d 1033 (2012). We also apply the same plenary standard of review to the trial court's interpretation of the charter as we would to a court's construction of a statute. See *Cook-Littman* v. *Board of Selectmen*, 328 Conn. 758, 767–68, 184 A.3d 253 (2018).

We first consider the text of the statute itself and its relationship to other statutes. See id. The Board of Representatives' appointment of Hamman in February, 2020, to fill the seat vacated by Cerasoli implicated § C1-80-2 (c) of the charter, which provides in relevant part: "When the Board of Representatives has elected a successor to fill a vacancy . . . on the Board of Education as set forth . . . in [§] C1-80-2 (b), then and in that event, *a vacancy election shall be held at the next biennial election.* . . .'' (Emphasis added.) The charter does not define the word "biennial." General Statutes § 1-1 (a) directs us to construe words that are not statutorily defined according to their commonly approved usage. *State* v. *Menditto*, 315 Conn. 861, 866, 110 A.3d 410 (2015). Dictionaries in print at the time of a provision's enactment are most instructive. Id. Webster's defines "biennial" as "[h]appening, or taking place, once in two years." Webster's New International Dictionary (2d Ed. 1953) p. 265; see also Black's Law Dictionary (4th Ed. 1968) p. 206 (defining "biennially" as "once in every two years").

Because § C1-80-2 (c) does not specify whether the charter's use of the phrase "next biennial election" means even numbered or odd numbered years, we look to related charter provisions for guidance. See *Studer* v. *Studer*, 320 Conn. 483, 489, 131 A.3d 240 (2016) (related

statutory provisions often provide guidance in deter-
mining meaning of particular word). Section C1-70-1 of
the charter provides in relevant part that, "[e]xcept
as hereinafter provided, on the Tuesday after the first
Monday in November, *1953 and biennially thereafter*,
there shall be held in Stamford an election to elect
officers. . . ."[5] (Emphasis added.) Because the first
biennial election in Stamford was held in 1953, an odd
numbered year, it is clear that successive biennial elec-
tions would also occur in odd numbered years.

Although the text of the charter itself is sufficient to
establish that biennial elections in the city are held
every other year in odd numbered years, this conclusion
is further supported by General Statutes § 9-164 (a),
which provides in relevant part: "Notwithstanding any
contrary provision of law, there shall be held in each
municipality, biennially, a municipal election . . . [in]
the odd-numbered years . . . ." See *Fay* v. *Merrill*, 336
Conn. 432, 446, 246 A.3d 970 (2020) (§ 1-2z instructs us
to consider text of statute and its relationship to other
statutes). Although § 9-164 does not require municipali-
ties to hold municipal elections biennially in odd num-
bered years, that is the legislature's default arrangement,
and the charter contains no contrary provision but
instead contains a provision that is consistent with § 9-
164. Therefore, in the present case, the vacancy election
for the board position would properly be held in Novem-
ber, 2021—not in November, 2020, as the plaintiff
argues and the city originally planned.

The plaintiff is correct that, at the time of the adoption
of § C1-70-1, city elections were held only biennially,
in odd numbered years. In 1969, the city moved to
annual elections for board positions, with three of the
nine board members elected each year to staggered

---

[5] Section C1-80-1 of the Stamford Charter provides that members of the
board are elective officers.

O'Shea *v.* Scherban

three year terms. See 34 Spec. Acts 74, No. 96 (1969). Therefore, the city now also holds elections in the intervening even numbered years for full-term board positions. The plaintiff argues that this fact demonstrates an intent that, as used in the charter, "biennial" means "the next town election." As our analysis makes clear, however, § C1-80-2, read together with § C1-70-1, unambiguously provides that elections for vacant positions on the board are held at the next biennial election, which is held only in odd numbered years. Because the charter is clear on this point, we do not consider circumstances surrounding the provision's enactment. See, e.g., *State* v. *Rupar*, 293 Conn. 489, 510–11, 978 A.2d 502 (2009).

Nevertheless, the plaintiff argues that the charter's savings provision, § C1-40-2,[6] when read together with § 9-220,[7] compels the opposite conclusion. Specifically, she contends that, because § 9-220 provides that the city "shall, except as otherwise provided by law, fill the vacancy [in elective office] at the next town election or at a special election called for such purpose," and because the savings provision requires the city to construe state statutes in harmony with the charter provisions, the city must fill the vacant board position at the next town election, not at the next biennial election. This argument ignores the phrase, "except as otherwise provided by law," in § 9-220. Section C1-80-2 clearly provides otherwise; that is, vacancy positions for the board are to be held at the next biennial election. There is no conflict between the charter and § 9-220.

---

[6] Section C1-40-2 of the Stamford Charter provides in relevant part: "Nothing contained in this Act shall be construed to repeal or terminate any statute of the State or ordinance of the City or any rule or regulation of any City Board, Commission, Department, Agency, or Authority. They shall remain in full force and effect, within the territorial limits of the City when not inconsistent with the provisions of this Charter, to be construed and operated in harmony with its provisions, until amended or repealed as herein provided. . . ."

[7] See footnote 4 of this opinion.

O'Shea *v.* Scherban

The plaintiff argues, however, that, even if § C1-80-2 is plain and unambiguous, its plain meaning leads to an absurd result. She makes much of the fact that board members are the only officers elected to staggered three year terms[8] and that, in the absence of a vacancy, board elections are held annually with three board positions up for election each year.[9] Because the city already holds elections for the board each year, the plaintiff argues, it is "absurd and unworkable" to limit vacancy elections to the board to biennial election years. We disagree. Vacancy elections differ from regular elections, in part because, on average, vacancies occur less frequently, and it is not always possible to predict when a vacancy will occur. A charter provision that responds to these considerations by requiring a different schedule for vacancy elections than for regular elections does not yield absurd or unworkable results.

Finally, the plaintiff argues that the city's interpretation of the charter raises first and fourteenth amendment due process issues and that the doctrine of constitutional avoidance therefore requires us to interpret "biennial election" as meaning "the next town election." Under the doctrine of constitutional avoidance, "[a] statute must be construed, if fairly possible, so as

---

[8] Section C1-70-3 of the Stamford Charter provides: "The terms of office of elective officers hereunder shall commence on the first day of December succeeding the election. The term of office of the Town and City Clerk shall be four (4) years; the City Constables shall be two (2) years and, commencing with the biennial election of 2013, the term of office for City Constables shall be four (4) years; the terms of office of the members of the Board of Representatives and the Mayor shall be four (4) years commencing, in accordance with Section C1-40-3 hereof, with the biennial election of 1997. The term of office of each member of the Board of Finance and of the Registrars of Voters shall be four (4) years. The term of office of each member of the Board of Education shall be three (3) years."

[9] Section C1-80-5 (a) of the Stamford Charter provides in relevant part: "Except as otherwise provided in [Section] C1-80-2 as to the filling of a vacancy, at each annual election, any political party may nominate not more than three candidates for membership on the Board of Education, to hold office for a three-year term, commencing on December first following the election. . . ."

to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.'' *United States* v. *Jin Fuey Moy*, 241 U.S. 394, 401, 36 S. Ct. 658, 60 L. Ed. 1061 (1916). The United States Supreme Court has held, however, that, to apply this doctrine, ''the statute must be *genuinely* susceptible to two constructions after, and not before, its complexities are unraveled.'' (Emphasis added.) *Almendarez-Torres* v. *United States*, 523 U.S. 224, 238, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998). This court has similarly held that it will apply the doctrine of constitutional avoidance ''[i]f literal construction of a statute raises *serious* constitutional questions . . . .'' (Emphasis added.) *Sassone* v. *Lepore*, 226 Conn. 773, 785, 629 A.2d 357 (1993). As we discuss in parts II and III of this opinion, the plaintiff has not clearly articulated why the charter's plain meaning raises a risk of serious constitutional infirmity. Therefore, because we do not find the charter genuinely susceptible to two constructions, or that its plain meaning raises serious constitutional questions, we find the doctrine of constitutional avoidance inapplicable.

II

The plaintiff next claims that a charter provision limiting vacancy elections to odd numbered years violates the first amendment to the United States constitution, as applied to the states through the due process clause of the fourteenth amendment.[10] The plaintiff also claims that the city's failure to validate the votes cast in November, 2020, disenfranchises her. We address these claims in turn.

The constitutionality of a charter provision, as with statutes, presents a question of law over which our

[10] To the extent the plaintiff raises fourteenth amendment due process or equal protection claims, they are inadequately briefed and we therefore do not consider them. See *State* v. *Buhl*, 321 Conn. 688, 728–29, 138 A.3d 868 (2016).

O'Shea *v.* Scherban

review is plenary. A validly enacted statute or charter provision carries with it a strong presumption of constitutionality, and we will indulge every presumption in favor of its constitutionality and sustain it unless its invalidity is clear. The plaintiff thus must sustain the heavy burden of proving the statute's unconstitutionality beyond a reasonable doubt. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 405, 119 A.3d 462 (2015).

A

To the extent the plaintiff challenges the constitutionality of the charter provision on its face, she has not clearly articulated a specific constitutional claim or provided sufficient analysis or relevant authority to support her claim.[11] Insofar as the plaintiff argues that it is unconstitutional for the charter's vacancy election provision to require skipping the city's next regularly scheduled election at which a full-term board position would be on the ballot, it is well established that a municipal government has "vast leeway in the management of its internal affairs." *Sailors* v. *Board of Education*, 387 U.S. 105, 109, 87 S. Ct. 1549, 18 L. Ed. 2d 650 (1967). This leeway generally includes the ability to decide whether local officers are appointed or elected.[12] Id.,

[11] When pressed at oral argument before this court, the plaintiff's appellate counsel stated that the specific constitutional violation was "depriving citizens of a right to representation." We do not find this to be a clearly articulated constitutional claim.

[12] In *Sailors*, the court held that the board of education was a nonlegislative body and that there was no constitutional reason why board members could not be appointed rather than elected. *Sailors* v. *Board of Education*, supra, 387 U.S. 108. Although the court did not expressly consider whether the rule would also apply to legislative bodies; id., 109–10; the plaintiff does not argue that Connecticut boards of education are legislative bodies, and our case law strongly suggests that they are not. See *Stratford* v. *State Board of Mediation & Arbitration*, 239 Conn. 32, 49, 681 A.2d 281 (1996) (local board of education was not "legislative body of the municipal employer" because, "[a]lthough a local board of education has an important role in setting educational policy, its responsibilities do not customarily encompass the enactment of ordinances" (internal quotation marks omitted)).

111. Therefore, it is not surprising to find that Connecticut law provides municipalities the flexibility to decide whether members of local boards of education are elected or appointed.[13] See General Statutes § 9-185 (*"Unless otherwise provided by special act or charter* . . . members of boards of education . . . shall be elected" (emphasis added)); see also *Cheshire* v. *McKenney*, 182 Conn. 253, 259, 438 A.2d 88 (1980) (local boards of education "are either elected by local constituencies; General Statutes § 9-203; or, pursuant to the town charter, are appointed by an elected officer or body of the municipality"). New Haven is an example of a municipality that has taken advantage of this flexibility. See New Haven Charter, tit. I, art. VII, § 3 (A) (2) ("the Board of Education shall consist of seven (7) members as follows: the Mayor, four (4) members appointed by the Mayor, subject to approval by the Board of Alders; and two (2) elected by district"). Therefore, the plaintiff's argument founders at its premise: there is no right to the direct election of members of a local board of education in Connecticut at all, let alone a right to have a vacancy election conducted at the earliest possible election.

It is also well settled that, when vacant offices are in fact filled by election, the federal constitution permits some delay in the holding of vacancy elections. In *Rodriguez* v. *Popular Democratic Party*, 457 U.S. 1, 102 S. Ct. 2194, 72 L. Ed. 2d 628 (1982), the United States Supreme Court upheld a statute allowing the governor of Puerto Rico to appoint an interim replace-

---

[13] Local boards of education are creatures of the state, authorized by statute. See General Statutes § 10-218 et seq.; see also General Statutes §§ 9-203 through 9-206a. However, "the powers of local boards of education are not defined only by state statute, and . . . a local charter may limit the powers of the local board of education [when] its provisions are 'not inconsistent with or inimical to the efficient and proper operation of the educational system otherwise entrusted by state law to the local boards.' " *Cheshire* v. *McKenney*, 182 Conn. 253, 259, 438 A.2d 88 (1980).

O'Shea *v.* Scherban

ment to fill a vacant seat in the Puerto Rico House of Representatives until the next general election. See id., 3, 14. In *Rodriguez*, a member of the Puerto Rico legislature died in January, 1981, less than three months after his election. Id., 3. The plaintiffs in *Rodriguez* claimed that they had a federal constitutional right to a special vacancy election held before the next general election and that the interim appointment process set forth in the commonwealth's statutes violated their right of association under the first amendment. Id., 7. The court held against the plaintiffs. See id., 14.

In arriving at its decision, the court in *Rodriguez* relied on the reasoning of another vacancy election case, *Valenti* v. *Rockefeller*, 292 F. Supp. 851 (S.D.N.Y. 1968), aff'd, 393 U.S. 405, 89 S. Ct. 689, 21 L. Ed. 2d 635 (1969), and aff'd sub nom. *Phillips* v. *Rockefeller*, 393 U.S. 406, 89 S. Ct. 693, 21 L. Ed. 2d 636 (1969), and aff'd sub nom. *Backer* v. *Rockefeller*, 393 U.S. 404, 89 S. Ct. 693, 21 L. Ed. 2d 635 (1969). See *Rodriguez* v. *Popular Democratic Party*, supra, 457 U.S. 10–12. *Valenti* involved a seventeenth amendment challenge to a New York state law requiring a vacant United States Senate position to be filled not at the next election but at the next election *in an even numbered year. Valenti* v. *Rockefeller*, supra, 853. In *Valenti*, the court held that New York was not required to hold an election in either 1968 or 1969 for a vacancy that occurred in 1968, and that the state law requiring the vacancy election to wait until 1970 was constitutional. Id., 853–54.

In relying on the reasoning in *Valenti*, the court in *Rodriguez* explained: "[T]he fact that the [s]eventeenth [a]mendment permits a [s]tate, if it chooses, to forgo a special election in favor of a temporary appointment to the United States Senate suggests that a state is not constitutionally prohibited from exercising similar latitude with regard to vacancies in its own legislature. We discern nothing in the [f]ederal [c]onstitution that

O'Shea *v.* Scherban

imposes greater constraints on the [c]ommonwealth of Puerto Rico.

"The [c]ommonwealth's choice to fill legislative vacancies by appointment rather than by a full-scale special election may have some effect on the right of its citizens to elect the members of the Puerto Rico [l]egislature; however, the effect is minimal, and like that in *Valenti*, it does not fall disproportionately on any discrete group of voters, candidates, or political parties. . . . Moreover, the interim appointment system plainly serves the legitimate purpose of ensuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election. The [c]onstitution does not preclude this practical and widely accepted means of addressing an infrequent problem." (Citation omitted.) *Rodriguez* v. *Popular Democratic Party*, supra, 457 U.S. 11–12.

Here, the plaintiff appears to argue that the first amendment requires the city to hold an election for a vacant board position at the next regularly scheduled city election, in this case the November, 2020 election during which three full-term board positions were also on the ballot. It is true that the charter provision in this case differs from the statute at issue in *Rodriguez* because, in *Rodriguez*, no regularly scheduled election passed before the vacancy was filled. See generally id. Rather, the court in *Rodriguez* held that no *special* election was constitutionally required. Id., 12. In *Valenti*, however, the statute that was upheld required voters to wait through *two* more regularly scheduled elections before casting a vote to fill the vacancy. *Valenti* v. *Rockefeller*, supra, 292 F. Supp. 855. Although it is true that *Valenti* involved the seventeenth amendment, which is not at issue in this case, considered together, *Rodriguez* and *Valenti* (neither of which the plaintiff has considered in her brief) strongly suggest that it does not violate the federal constitution to delay the

O'Shea *v.* Scherban

holding of a vacancy election until the "next biennial election." The plaintiff has presented us with no authority, and this court is aware of none, holding such a provision to be unconstitutional in the thirty-nine years since *Rodriguez*.[14]

B

To the extent the plaintiff claims that the federal constitution entitles her to have the votes counted and the void election validated, we disagree. The plaintiff claims that, even if the charter itself is not constitutionally infirm, the constitution requires that the votes in the election that the city declared void must be counted and the outcome honored because (1) the city having placed the position on the ballot, votes were actually cast for that position, and (2) there was an established past practice of holding vacancy elections in even numbered years.

As discussed in part I of this opinion, the plain language of the charter means that no valid vacancy election for the board position at issue could have been held in November, 2020. "[T]he right or power to hold an election must be based on authority conferred by law, and an election held without affirmative constitu-

_____

[14] Because we conclude that the plaintiff has not advanced a serious challenge to the constitutionality of the charter provision by providing authority in support of her claim that the constitution demands that the city fill the vacancy at the next election, we also decline to analyze the provision under either the strict scrutiny standard of review or the *Anderson-Burdick* balancing test, which demands an analysis of competing interests that the plaintiff fails to provide. See *Burdick* v. *Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992); *Anderson* v. *Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983); see *Burdick* v. *Takushi*, supra, 434 ("[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the [f]irst and [f]ourteenth [a]mendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights' ").

O'Shea *v.* Scherban

tional or statutory authority, or contrary to a material provision of the law, is a nullity, even though it is fairly and honestly conducted.'' 29 C.J.S. 135–36, Elections § 127 (2005). ''A court lacks jurisdiction to authorize or compel the holding of a void election.'' Id., p. 136.

It is unfortunate that votes were cast for the position that appeared on the ballot in error, but this fact does not mean that an election for the board vacancy position appropriately took place. Similarly, the fact that the votes cast were initially reported in the secretary's election management system does not mean that an election for the position took place.[15] The plaintiff has not presented us with any authority, and we are aware of none, suggesting that constitutional principles require us to validate a void election.

The plaintiff argues that, to avoid unconstitutionally disenfranchising her, the votes cast should be counted and the outcome of the ''election'' honored. She cites several cases in support of this position: *Roe* v. *Alabama*, 68 F.3d 404 (11th Cir. 1995), *Griffin* v. *Burns*, 570 F.2d 1065 (1st Cir. 1978), *Briscoe* v. *Kusper*, 435 F.2d 1046 (7th Cir. 1970), *Hoblock* v. *Albany County Board of Elections*, 487 F. Supp. 2d 90 (N.D.N.Y. 2006), and *Williams* v. *Sclafani*, 444 F. Supp. 906 (S.D.N.Y.), aff'd sub nom. *Williams* v. *Velez*, 580 F.2d 1046 (2d Cir. 1978). Each of those cases indeed involved rulings by

---

[15] Although we ultimately agree with the defendants in the present case that an election should not have been held and that the race should not have appeared on any ballots, until the trial court and, ultimately, this court ruled on the matter, this outcome was not clear. When the validity of an election is unclear, the wisest course would be for the head moderator to include the disputed votes for the vacant position in his final report to the secretary of the state. Although reporting votes cast in a void election might not be required by statute, at the time the votes were reported, there was no legally conclusive decision that the election was void. That determination is made today, when this opinion is officially released. As a result, the votes should be recorded for historical purposes and to assist courts in the event of a challenge to the validity of the election or any ruling of an election official.

O'Shea *v.* Scherban

election officials that resulted in the rejection of ballots cast. The difference, however, is that each of those cases involved a valid election or primary election.[16] Here, by contrast, the election itself was void. We agree with the trial court that, when "the charter specifies the method for filling vacancies, that method cannot be changed by a mistake of an election official. If the charter does not authorize an election, then an election cannot be held."

In fact, it would disenfranchise the city's voters, who adopted the charter, to *count* the ballots cast in the void election and disregard the provisions of the charter directing that vacancies must be filled at a biennial election held in odd numbered years. "[T]he electors have not been deprived of their opportunity to participate in the democratic process with respect to the procedure for filling a vacancy because, [a]s the source of a municipality's powers, charters are generally adopted and amended at a referendum by the municipality's electors." (Internal quotation marks omitted.) *Cook-Littman* v. *Board of Selectmen*, supra, 328 Conn. 779. Validating a void election would also disenfranchise the many voters who opted not to cast any vote in the election in reliance on the city's announcement of its

---

[16] For example, in *Hoblock*, the issue was the rejection of absentee ballots that were cast but subsequently rejected in a valid election. *Hoblock* v. *Albany County Board of Elections*, supra, 487 F. Supp. 2d 97–98. The absentee ballots issued to voters were invalid; id., 95; but the underlying election was valid. Id., 98. In *Griffin*, the issue was the rejection of all absentee ballots cast in a valid primary election. *Griffin* v. *Burns*, supra, 570 F.2d 1074. *Roe* v. *Alabama*, supra, 68 F.3d 405, also involved contested absentee ballots in an otherwise valid election. In *Briscoe*, the issue was the invalidation of nominating petitions, signed in a previously acceptable way, after election officials had adopted new regulations without prior publication or an opportunity for candidates to respond when an election official invalidated any signature. *Briscoe* v. *Kusper*, supra, 435 F.2d 1054–55. Similarly, *Williams* v. *Sclafani*, supra, 444 F. Supp. 909, involved the validation of designating petitions required for placement on a primary ballot.

O'Shea *v.* Scherban

correct conclusion that the position had been placed on the ballot in error.[17]

This analysis is consistent with our recent decision in *Cook-Littman*, in which the trial court, construing the charter of the town of Fairfield, ordered the town to conduct a special election to fill a vacant seat on the Board of Selectmen that already had been filled by appointment. Id., 762, 764–65. This court reversed the trial court's judgment, holding that the special election was invalid and that the trial court could not substitute its own ideas for a clear expression of legislative will. See id., 779. By the time the case had come before this court, the special election the trial court had ordered already had been held, and the winner of that election had replaced the person appointed to fill the vacancy. Id., 765–66. Because the election was never valid, however, this court held that the appointee was entitled to reinstatement. Id., 779. Although no constitutional claims were raised in *Cook-Littman*, that case makes clear that following the express terms of a charter adopted by the voters does not result in disenfranchisement.

The parties' stipulation that a board vacancy election was held in Stamford in 2016 does not change our analysis. The plaintiff contends that this creates an "established past practice" and appears to argue that, if a city violated its charter in the past, it must continue to do so going forward. But a void election is a void election, regardless of whether it is the result of a onetime mistake by an election official or a similar past mistake. The confusion the city's error caused is regrettable. But neither the fact that the city held another vacancy election in 2016 nor the fact that some voters cast absen-

---

[17] The candidates for the full-term board positions properly on the ballot received more than 22,000 votes each. The plaintiff, who received the highest number of votes for the vacant position that appeared on the ballot, received 578 votes.

O'Shea *v.* Scherban

tee ballots in the 2020 election changes the fact that there was no valid election for the board vacancy position, and, thus, no voters were disenfranchised by the city's failure to count and certify the votes cast.

III

The plaintiff next claims that, even if the charter provision does not violate the federal constitution, it conflicts with the greater protections afforded by the Connecticut constitution. The defendants contend that the charter provision has a legitimate governmental purpose—to have a single process for filling vacancies, regardless of the office—and that there is no state constitutional principle that provides that vacancies must be filled by election as soon as possible. We conclude that the plaintiff has not demonstrated that the Connecticut constitution affords greater protections under the facts of this case.

As in part II of this opinion, our review of whether a charter provision violates the state constitution is plenary. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 405. In *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), "we identified six nonexclusive tools of analysis to be considered, to the extent applicable, whenever we are called on as a matter of first impression to define the scope and parameters of the state constitution: (1) persuasive relevant federal precedents; (2) historical insights into the intent of our constitutional forebears; (3) the operative constitutional text; (4) related Connecticut precedents; (5) persuasive precedents of other states; and (6) . . . relevant public policies." (Internal quotation marks omitted.) *State* v. *McCleese*, 333 Conn. 378, 387, 215 A.3d 1154 (2019). "It is not critical to a proper *Geisler* analysis that we discuss the various factors in any particular order or even that we address each factor." Id., 388.

O'Shea *v.* Scherban

As for the *Geisler* factors concerning constitutional text, federal and Connecticut precedents and public policy, the plaintiff has primarily recited unhelpful truisms—that the state constitution in some contexts provides Connecticut citizens greater protection than the federal constitution. The plaintiff does not engage in any real analysis suggesting that the constitutional text, Connecticut precedent, or federal precedent supports an enhanced state constitutional right. As discussed in part II of this opinion, we conclude that federal precedent does not support the plaintiff's claim. The plaintiff does not address our state constitutional history at all, except to say that "the intent of our constitutional forebears to protect these fundamental, foundational rights is made clear by the sheer number of overlapping applicable rights set forth in the Connecticut constitution."

With respect to authority from other jurisdictions, the plaintiff cites numerous out-of-state cases in support of her argument that the state constitution requires vacancy positions to be filled by election—as opposed to by appointment—as soon as possible. We do not find any of these cases to be persuasive. Most come from states with constitutional provisions that expressly address vacancy elections and require that vacancies be filled in a particular way or within a particular time frame. See *Bolin* v. *Superior Court*, 85 Ariz. 131, 137–38, 333 P.2d 295 (1958); *State* v. *Highfield*, 34 Del. 272, 283–84, 152 A. 45 (1930); *Roher* v. *Dinkins*, 32 N.Y.2d 180, 184–86, 298 N.E.2d 37, 344 N.Y.S.2d 841 (1973); *Rodwell* v. *Rowland*, 137 N.C. 617, 618, 50 S.E. 319 (1905); *State ex rel. Whitney* v. *Johns*, 3 Or. 533, 534–35 (1869); *Commonwealth* v. *Maxwell*, 27 Pa. 444, 449 (1856).[18] Our constitution contains no such provision

_____

[18] In *State ex rel. Toledo* v. *Lucas County Board of Elections*, 95 Ohio St. 3d 73, 76–78, 765 N.E.2d 854 (2002), the court followed the applicable provisions of the city charter of Toledo, Ohio, holding that those provisions were not in conflict with the Ohio constitution.

O'Shea *v.* Scherban

pertaining to the vacancy at issue in this case. And in
*State ex rel. Harsha* v. *Troxel*, 125 Ohio St. 235, 237–38,
181 N.E. 16 (1932), another case on which the plaintiff
relies, the applicable statute contained *no* mechanism
for filling a vacancy by appointment, which meant that
the position would remain completely unfilled in the
absence of a vacancy election.

The plaintiff advances no authority, and we are aware
of none, indicating that any of the *Geisler* factors sup-
port her claim that the state constitution provides
greater protection than the federal constitution under
the facts of this case.

IV

Finally, the plaintiff claims that the doctrine of munic-
ipal estoppel requires the defendants to count the votes
cast because the vacant position appeared on the ballot
for the November, 2020 election. Specifically, she
argues that she detrimentally relied on the position's
appearance on the ballot by filing the proper forms to
register as a write-in candidate and undertaking the
effort to run a race for the vacant position. We disagree
that municipal estoppel can be used to validate a
void election.

"[F]or a court to invoke municipal estoppel, the
aggrieved party must establish that: (1) an authorized
agent of the municipality had done or said something
calculated or intended to induce the party to believe
that certain facts existed and to act on that belief; (2)
the party had exercised due diligence to ascertain the
truth and not only lacked knowledge of the true state
of things, but also had no convenient means of acquiring
that knowledge; (3) the party had changed its position
in reliance on those facts; and (4) the party would be
subjected to a substantial loss if the municipality were
permitted to negate the acts of its agents." (Internal
quotation marks omitted.) *Levine* v. *Sterling*, 300 Conn.

521, 535, 16 A.3d 664 (2011). The party claiming estoppel has the burden of proof. Id. "Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) Id.

The trial court did not address the plaintiff's municipal estoppel claim in its memorandum of decision, although both parties briefed the issue before the trial court. Because the issue of whether the plaintiff has met her burden is a question of fact and the trial court did not make such a finding, under ordinary circumstances, we might consider whether a remand to or an articulation by the trial court would be required. See Practice Book § 61-10 (b); *Russo* v. *Waterbury*, supra, 304 Conn. 737. However, "[t]here are times . . . when the undisputed facts or uncontroverted evidence and testimony in the record make a factual conclusion inevitable so that a remand to the trial court for a determination would be unnecessary." (Internal quotation marks omitted.) *Russo* v. *Waterbury*, supra, 737. In the present case, a remand would be pointless because the trial court could reach only one conclusion—that the estoppel claim fails. First, as previously discussed, under the present circumstances, there was no valid election. The plaintiff cannot show that she would be subjected to a substantial loss in this case because, under the charter, there was no election in which she could run. Therefore, there was no seat to lose. In addition, the plaintiff cannot show that she "lacked knowledge of the true state of things" or had "no convenient means of acquiring that knowledge . . . ." (Internal quotation marks omitted.) *Levine* v. *Sterling*, supra, 300 Conn. 535. Although it is true that eleven days passed between the time when the plaintiff registered as a write-in candidate and when she met with city officials to discuss the error, had the plaintiff exercised due diligence by reading the charter or asking the city for clarification before

registering as a write-in candidate, she could have avoided any harm resulting from her misapprehension of the charter. The intervenor in this case, who appears to have been the first to discover and report on the ballot error in an October 9, 2020 blog post, did exactly that. Finally, the plaintiff also had actual knowledge of the true state of affairs no later than October 16, 2020, when Mayor Martin and Attorney Emmett met with the plaintiff after discovering that the position had been placed on the ballot in error. Because the plaintiff has failed to sustain her burden of establishing a necessary element of municipal estoppel, we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.

———————————————